JEAN SLEZAK, Special Adm'x of the Estate of Edward Slezak, Plaintiff-Appellant, v. DANIEL GIRZADAS, Defendant-Appellee.

First District (1st Division) No. 86—3583

Opinion filed March 8, 1988.

1046

John E. Navigato and Vincent Petrosino, both of Serpico, Novelle, Dvorak & Navigato, Ltd., of Chicago, for appellant.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Richard G. French, Michael C. Kominiarek, and Russell P. Veldenz, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, Jean Slezak, special administratrix of the estate of Edward Slezak, appeals from an order directing a verdict in favor of defendant, Dr. Daniel Girzadas, an orthopedic surgeon, in a medical malpractice action. The sole issue on appeal is whether the trial court erred by refusing to qualify plaintiff's expert witness as a medical expert on the ground that he had failed to establish that he was familiar with the community standards as practiced by orthopedic surgeons in the Chicagoland area and, consequently, entering a directed verdict in favor of defendant. For the following reasons, we reverse the judgment of the trial court and remand the cause for a new trial.

The record sets forth the following undisputed facts. On October 19, 1977, Edward Slezak accidently slipped and fell into an open pit on a jobsite at which he was working. As a result of the fall, Edward sustained a fracture of the right hip and was immediately taken to Lutheran General Hospital. Shortly thereafter, he was removed to Christ Hospital, which was located closer to his home.

On October 21, 1977, defendant, an orthopedic surgeon, performed an open reduction of the base or neck of Edward's femur, using a plate and screw fixation device known as a Zimmer plate, commonly used for this type of fracture. In this procedure, the surgeon drills a hole into the ball of the hip joint and the neck of the plate is placed in the hole. A side plate then runs down the outside of the femur. A compression screw tightens up and holds the two pieces of bone in anatomical position. The physician then secures the plate by drilling four holes through the bone and inserting four screws.

Edward did not appear to suffer any complications from the surgery, but remained in the hospital to convalesce. On the morning of November 5, 1977, when Edward's wife and friends visited him at the hospital, he appeared fine. However, approximately 2 p.m. that afternoon, the hospital called Edward's family to inform them that he had suffered a complication and was in intensive care. Later that day, Edward died. A subsequent autopsy revealed the cause of death to have been a pulmonary embolism.

On October 26, 1979, plaintiff filed a wrongful death action against defendant and Christ Hospital. After several amendments, Christ Hospital was dismissed and a third amended complaint was filed against only defendant. On August 27, 1986, a jury trial commenced. During her case in chief, plaintiff elicited testimony from Edward's employer, his wife and two children. As her last witness, plaintiff called Dr. Richard Laskin, an orthopedic surgeon, to testify as an expert witness as to the applicable standard of care and defendant's alleged deviation from that standard. Dr. Laskin testified, *inter alia*, that he is a board-certified orthopedic surgeon and is chairman of orthopedic surgery at Long Island Jewish Hospital, a major teaching hospital in New York City. In addition, Dr. Laskin is a member of numerous medical societies, is a professor of orthopedic surgery at State University in Stonybrook, New York, a lecturer, and has published approximately 42 papers, three of which dealt with the management, treatment and reconstruction of fractured hips by means of internal fixation. Further, Dr. Laskin had operated on approximately 1,000 hip fractures and had written the instructional brochure for surgeons which explains how to insert the Zimmer plate.

Following testimony as to Laskin's medical credentials, the following questioning ensued:

"COUNSEL: Dr. Laskin, based on your experience as a practicing orthopedic surgeon for the past 15 years, *** are you familiar with the community standards as practiced, customary and usual standards as practiced by orthopedic surgeons in the

Chicagoland area?

LASKIN: I—I am familiar with the customary standards in the New York area. I would assume they are the same in Chicago.

COUNSEL: New York area is a large metropolitan area?

LASKIN: Yes, it is.

COUNSEL: Have you, have you visited here in Chicago and observed surgery procedures being performed?"

At this point, defense counsel objected and the court sustained the objection as "to the form of the question." Plaintiff's counsel then asked: "Are you familiar with the standards as practiced in Chicago?" Defense counsel objected again and the objection was sustained on the ground that the question had been asked and answered. Plaintiff's counsel then asked:

"Are the standards in Chicago the same, is it your understanding that the standards as practiced by orthopedic surgeons in New York are the same as they are in Chicago?"

Again, defense counsel's objection was sustained. Plaintiff's counsel then requested a sidebar, and in chambers, defense counsel argued that when Laskin stated that he assumed that the medical standards in Chicago and New York were the same, he, in fact, indicated that he did not actually know. The trial court agreed and stated that plaintiff's counsel had to establish that Laskin is familiar with the customary practice and standards in Chicago.

Subsequently, in the presence of the jury, plaintiff's counsel asked Laskin:

"Upon what do you base your assumption, Dr. Laskin, that the standards as practiced in Chicago are similar or the same as practiced in New York?"

Again, defense counsel objected and the court sustained the objection. No grounds were given. Next, plaintiff's counsel attempted to get a response to the following question:

"Doctor, based upon your experience as a practicing orthopedic physician, the fact that you have lectured throughout the country and your association with the American Academy of Orthopedic Surgeons, can you tell us whether there's a uniform standard of care, national uniform standard of care practiced by orthopedic physicians?"

Defense counsel objected and, again, the court sustained the objection as "to the form of the question." When plaintiff's counsel asked what was wrong with the form, the court ordered a sidebar in his chambers, where defense counsel explained that the basis for his objection

was the fact that Dr. Laskin had already indicated he did not know what the standard is in Chicago, and the existence of a uniform standard does not mean that that uniform standard applies in Chicago. Plaintiff's counsel then asked the court whether he would be allowed to ask Dr. Laskin whether there is a national standard. The trial court replied:

> "The national standard is not an issue here. I thought we understood one another that the community standard that's practiced in the Chicagoland area is what is at issue."

When plaintiff's counsel resumed questioning Dr. Laskin, in an attempt to learn on what grounds he had made his assumption, he was never able to elicit a response because defense counsel's objections were continuously sustained. Finally, plaintiff's counsel stated that he wished to make an offer of proof.

In the offer of proof, which was given in chambers, Dr. Laskin stated that the basis for his assumption that the standards of care practiced in New York are the same as those in Chicago is that both are large metropolitan areas, economically similar and similar with respect to medical expertise. Further, the headquarters of the Orthopedic Academy are located in Chicago. Dr. Laskin also stated that he had lectured in Chicago on orthopedic topics and had learned that the concepts and ideas of the practitioners were the same in both cities. Dr. Laskin further stated that he believed the medical school associated with Rush-Presbyterian St. Luke's was comparable to medical schools in Long Island.

In response, defense counsel argued that the offer of proof did nothing more than confirm that Dr. Laskin can only assume the standards of care in New York and Chicago are similar. He does not know. Following a brief recess, Dr. Laskin resumed the stand and plaintiff's counsel queried him about the certification examination conducted by the American Board of Orthopedic Surgeons and given to all applicants or candidates who wish to become board-certified. Dr. Laskin indicated that the test was national and is given so as to maintain a similar standard of orthopedics throughout the country.

Next, plaintiff's counsel showed Dr. Laskin copies of Edward's hospital records, slides taken by the coroner during Edward's autopsy, and an X ray taken of Edward seven days after his surgery. When plaintiff's counsel asked Dr. Laskin if these materials were customarily relied upon by physicians in caring and treating patients, defense counsel objected and the court sustained the objection. When plaintiff's counsel queried as to the basis for the objection, a sidebar ensued outside of the jury's presence during which defense counsel ar-

gued that because Dr. Laskin was never qualified to testify as an expert, he should not give an opinion. Plaintiff's counsel then stated that he wished to make another offer of proof and called Dr. Laskin into the chambers. Dr. Laskin then testified that based upon his review of the slides and other materials, that it was his opinion that defendant had deviated from good and accepted medical care. In particular, Dr. Laskin stated that the materials indicated that several of the screws used in the Zimmer plate protruded beyond the accepted one-eighth of an inch. Dr. Laskin further stated that when the screws protrude too far, there is potential risk of danger to the muscle, any veins, arteries, or nerves in that area. When the offer of proof concluded, defense counsel objected.

Immediately after Dr. Laskin's offer of proof, plaintiff's counsel stated that he would like to make a further offer of proof as to the testimony of Dr. Robert Stein, Cook County coroner, regarding the proximate cause of Edward's death. In light of the fact that the court had refused to qualify Dr. Laskin as an expert witness to testify as to the standard of care and deviation from it, plaintiff's counsel did not have Dr. Stein present in the courtroom so as to personally make the offer of proof. Instead, plaintiff's counsel made the offer of proof himself, stating that Dr. Stein would testify that based upon the autopsy, Edward's cause of death was a pulmonary embolism. Further, the source of the embolism was the laceration of the veins in Edward's right leg, which was caused by one or more of the four protruding screws in the Zimmer plate. The lacerations created intervascular thrombosis of blood clots which traveled and grew through the venous system. Plaintiff's counsel further stated that Dr. Stein would testify that the proximate cause of death was the protruding screw tips.

Defense counsel objected to the offer of proof on the grounds that Dr. Stein would not so testify and that Dr. Stein's training did not qualify him to so testify. Plaintiff's counsel then moved for a mistrial based upon the trial court's narrow interpretation of the "similar locality" rule. The motion was denied and defense counsel moved for a directed verdict, which was granted. Plaintiff's appeal followed.

■ It is well established that a trial court may direct a verdict if all the evidence, when viewed most favorably toward the nonmovant, so overwhelmingly favors the movant that a contrary result could not be justified. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Upon review of a directed verdict, the appellate court must determine whether the evidence could ever support a contrary verdict. If it could, the trial court's judgment will be reversed. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463

N.E.2d 216.) In medical malpractice cases, application of the *Pedrick* standard requires the reviewing court to scrutinize the evidence submitted by plaintiff to establish the standard of care the defendant was required to meet, to demonstrate a deviation from that standard and to indicate how that deviation was the proximate cause of plaintiff's injuries. *Duvall v. Laidlaw* (1986), 141 Ill. App. 3d 717, 492 N.E.2d 508.

In determining the appropriate standard of care, Illinois follows the "similar locality" rule, which requires physicians to possess and apply the knowledge, skill and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case. (*Duvall v. Laidlaw* (1986), 141 Ill. App. 3d 717, 492 N.E.2d 508.) In *Purtill v. Hess* (1986), 111 Ill. 2d 229, 246, 489 N.E.2d 867, the supreme court recognized that because today there are "relatively uniform standards for the education and the licensing of physicians," the "similar locality" rule is to be read broadly. Accordingly, the *Purtill* court held that an expert will be qualified to testify as to the standard of care in a medical malpractice action if: (1) the expert is familiar with the standards of care applicable to conditions and facilities available to the defendant doctor; or (2) there are certain uniform standards applicable despite the locality. (111 Ill. 2d at 247.) The *Purtill* court further stated that a doctor who is familiar with the national, uniform, minimum standards rather than local, minimal, nonspecialized standards is considered to be knowledgeable of all localities, including the place of treatment. 111 Ill. 2d at 250.

In the present case, the underlying cause of the medical malpractice action was defendant's allegedly negligent insertion of the Zimmer plate into Edward. As stated by defense counsel prior to trial, the two issues before the court were: (1) whether the length of the screws used in the Zimmer plate deviated from the standard of care; and (2) whether that deviation caused the pulmonary embolism. It is undisputed that Dr. Laskin was an expert on the proper technique to insert the Zimmer plate, including the proper screws, as indicated by the fact that he had written the medical brochure which accompanies the plate and explains to surgeons how to insert the plate. Moreover, the evidence indicates that the same type of Zimmer plate was used nationwide. Thus, Dr. Laskin's familiarity with the proper technique for insertion of the plate in New York was equally applicable to the proper technique for insertion in Illinois. On this basis alone, we find that Dr. Laskin's testimony satisfied the "similar locality" rule and that he should have been qualified as an expert to testify on the standard of care regarding insertion of the Zimmer plate.

■ We further note that the trial court never afforded Dr. Laskin the opportunity to explain the basis of his assumption that New York and Chicago were similar or to testify as to a uniform standard of care. In fact, in direct contradiction to the holding in *Purtill*, the trial court erroneously stated that the national standard was irrelevant. As evidenced by Dr. Laskin's offer of proof, there is a standardized orthopedic test which indicates the existence of a uniform standard and, as stated, the instructional brochure for the Zimmer plate is distributed nationwide.

In addition, we find the following cases relied upon by plaintiff persuasive of her position: *Sadnick v. Doyle* (1987), 157 Ill. App. 3d 279, 510 N.E.2d 603; *Fultz v. Peart* (1986), 144 Ill. App. 3d 364, 494 N.E.2d 212; *Duvall v. Laidlaw* (1986), 141 Ill. App. 3d 717, 492 N.E.2d 508; *Hansbrough v. Kosyak* (1986), 141 Ill. App. 3d 538, 490 N.E.2d 181; and *Thompson v. Webb* (1985), 138 Ill. App. 3d 629, 486 N.E.2d 326. In *Sadnick*, plaintiff filed a medical malpractice action seeking to recover damages from defendant for his alleged negligence in removing a tattoo from her neck. Defendant practiced in La Salle County, Illinois. At trial, Dr. Halam Galal, a board-certified plastic surgeon who practiced in Cook County, Illinois, testified as plaintiff's expert. When questioned about the standard of care to remove a tattoo in La Salle County, defense counsel objected on the basis of the "similar locality" rule. The trial court sustained the objection on the ground that familiarity with local standards, rather than national standards, was critical. Dr. Galal further testified that although he was unfamiliar with the local standards of La Salle County, he was familiar with the minimal, nonspecialized uniform Illinois standards for such procedures. The trial court prohibited plaintiff's expert from testifying because of his unfamiliarity with local standards. Following Dr. Galal's offer of proof and additional testimony from defendant and defendant's expert, who testified as an adverse witness with regard to the standard of care, the trial court granted defendant's motion for a directed verdict. On appeal, the reviewing court, in reliance on *Purtill v. Hess*, reversed the trial court and remanded the cause for a new trial. In reaching its decision, the *Sadnick* court stated:

> "Under the *Purtill* rule, we find that the instant physician's standard of care to excise the plaintiff's tattoo was akin to nationally recognized uniform minimum standards, rather than local minimal, nonspecialized, treatment standards based on conditions and facilities available to the treating physician." 157 Ill. App. 3d at 283.

In the present case, Dr. Laskin was also erroneously disqualified as

an expert witness by his failure to testify that he was familiar with local standards when the offer of proof indicated there was a uniform national standard with which he was familiar.

Similarly, in *Fultz v. Peart* (1986), 144 Ill. App. 3d 364, 494 N.E.2d 212, plaintiff, a diabetic, filed suit against defendant pharmacy alleging negligence in filling his prescription with the wrong medication and against defendant doctor and medical clinic for negligent medical treatment. The jury returned a verdict in favor of plaintiff. On appeal, defendants argued that plaintiff had failed to present expert medical testimony from witnesses who qualified under the "similar locality" rule because neither expert was familiar with the standard applicable in southern Illinois. The appellate court disagreed. Although both experts practiced in the metropolitan area of St. Louis, Missouri, and were affiliated with major hospitals and medical schools in the St. Louis area, they both testified that, through contacts with other professionals, they were generally familiar with the standards of care in southern Illinois with respect to a diabetic who is out of control. Further, diabetes is not an uncommon disease and there is a national standard of care for treatment. Similarly, in our case, Dr. Laskin stated that he is familiar with Chicago orthopedic practices through lectures he has given in Chicago and the Zimmer plate and its instructional brochure are used nationally.

In *Duvall v. Laidlaw* (1986), 141 Ill. App. 3d 717, 492 N.E.2d 508, plaintiff underwent surgery in Champaign, Illinois, was released with a low-grade fever and was then prescribed antibiotics over the telephone. Plaintiff was subsequently readmitted to the hospital with acute abdominal infection and pus drainage from her original incision. As a result, she filed suit in Champaign County circuit court alleging that Drs. Laidlaw and Lane had been negligent in failing to diagnose and treat her post-operative infection promptly and in giving her advice over the telephone. Summary judgment was entered in favor of defendant doctors on the ground that plaintiff's expert had relied upon a national standard and was not familiar with the standard of care applicable in Champaign-Urbana. The appellate court reversed the trial court on the grounds that the expert had properly based his opinion on a uniform standard and that the expert had indicated his belief that all obstetrician-gynecologists were made aware of these standards in their training. Similarly, in our case, Dr. Laskin attempted to testify as to a national standard of care as indicated by both the national certification examination conducted by the American Board of Orthopedic Surgeons and the Zimmer plate instructional brochures he had written and which were distributed with the product nationwide.

In *Hansbrough v. Kosyak* (1986), 141 Ill. App. 3d 538, 490 N.E.2d 181, plaintiff was treated for severe fibrocystic disease by two doctors who both recommended immediate breast surgery with Silastic implants in Hoopeston Community Memorial Hospital. Severe complications arose. As a result, plaintiff filed an 11-count complaint in the circuit court of Vermilion County against Dr. Kosyak, Dr. Roller and Hoopeston Hospital, seeking to recover damages for alleged acts of malpractice during the course of treatment and surgery. Summary judgment was entered in favor of defendant doctors on the ground that, due to the trial court's decision to strike the expert's affidavits, there was no testimony as to the appropriate standard of care. Upon review, the appellate court held that because plaintiff's expert had based his opinion on a nationwide standard of care and was well-qualified in his field, the trial court had improperly struck the affidavit of plaintiff's expert. In reaching its decision, the court stated:

"We resist any interpretation whereby an expert, because he currently practices in the Chicago area, would be automatically disqualified from rendering an opinion as to standards in Hoopeston or similar communities under the 'similar locality' rule." (141 Ill. App. 3d at 545-46.)

As in *Hansbrough*, Dr. Laskin was extremely well qualified in his field and, if given the opportunity, would have testified as to a national standard.

Similarly, in *Thompson v. Webb* (1985), 138 Ill. App. 3d 629, 486 N.E.2d 326, the appellate court reversed an order granting summary judgment to defendant doctor who practiced in Mahomet, Illinois, 10 miles from Champaign. Defendant had diagnosed plaintiff as suffering from hemorrhoids when in fact he had a cancerous tumor in the rectum from which he died. The appellate court held that the trial court had applied an overly narrow interpretation of the "similar locality" rule and that there was sufficient evidence that plaintiff's expert, who practiced in Toledo, Ohio, was familiar with the standard of care in similar communities to provide a sufficient foundation. Similarly, in the present case, Dr. Laskin indicated that he practiced in a locality similar to that of Chicago and, as stated, that there was a national uniform standard of care.

Finally, we find *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072, relied upon by defendant, distinguishable on pivotal points and, thus, unpersuasive of defendant's position. In *Bartimus*, plaintiff's expert admitted to having no familiarity with medical practice in either defendant's community or a similar community and had never worked under conditions similar to

those under which defendant doctors had worked. By contrast, in our case, Dr. Laskin clearly indicated his familiarity with the Zimmer plate surgical procedure and testified as to the similarity of standard of care between New York and Chicago.

● ■ ■ In addition, defendant argues that plaintiff's offer of proof as to Dr. Stein's testimony was improper. In support of his argument, defendant presents only generalized statements and references to legal authority which do not support his contention that an offer of proof can only be presented when the trial court refuses to admit testimony. An offer of proof is used to indicate to the trial court and to opposing counsel, outside the presence of the jury, the substance of the evidence expected to be offered. Opposing counsel may then object to and the court may rule on the admissibility of the evidence. (*Peluso v. Singer General Precision, Inc.* (1977), 47 Ill. App. 3d 842, 365 N.E.2d 390.) The requisite formality of an offer of proof will depend upon the circumstances of the particular case. However, the offer of proof must be made in a proper manner and show what the offered proof is or what the expected testimony will be, by whom or how it was made, and what its purpose is. Where it is obvious that a witness is competent to testify as to a particular fact, and it is obvious what his testimony would be, a statement by counsel may be sufficient. (*Scaggs v. Horton* (1980), 85 Ill. App. 3d 541, 411 N.E.2d 870.) In light of the fact that plaintiff's counsel in the present case was continuously thwarted at every turn from eliciting testimony from plaintiff's medical expert, we find that counsel's decision to present an offer of proof as to Dr. Stein's testimony was not only proper, but was the most expedient manner by which to include the testimony as to proximate cause for review purposes. In our view, plaintiff's counsel was correct in stating that to have called Dr. Stein to the stand would have been contrary to the principle of judicial economy because, in the absence of expert medical testimony as to the standard of care, Dr. Stein's testimony as to proximate cause would not have prevented the entry of a directed verdict in favor of defendant.

For the aforementioned reasons, we reverse the judgment of the trial court and remand the cause for a new trial.

Reversed and remanded.

BUCKLEY and O'CONNOR, JJ., concur.